Tina Bender and Philip versus Julie Logan so far does not spport James Hennon. James Hennon for three points May it please the court. My name is James Cummins. We're appearing here for the appellant Tina Bender. With me at the council table is my colleague Adam Brown. I wanted to spend our time this morning dealing with two aspects of Judge Beckwith's order. One having to do with her view of liability and the state of the record with respect to the appellant's meeting that burden. And the second point being Judge Beckwith's treatment of the appellant's efforts to show a loss in connection with the securities fraud that that we have alleged. This case arises under 10b-5 and the first aspect of the record that we want to direct the court's attention to are the events of July of 2012. By way of background just to get us up to speed, a business had been formed, stock had been issued both to the appellant and to Julie Logan, one of the appellees, and one of the partners or co-business venturers called, according to the record, sent a text to the appellant in July of 2012. And that text constitutes a clear and uncontroverted statement that was false, misleading, a misrepresentation, and full of omissions, constituted by the following words, the text itself. The text was in evidence, by text I mean telephonic text. Scott Logan, one of the defendants, sends a text to the appellant and says, could you come, I'm paraphrasing until we get to the operative misrepresentations and omission. He calls her and he texts her and asks her to come to meet with him to sign some papers. And here I quote the misrepresentations. He says, nothing major, just leftover stuff unsigned from 2011 business year. And she does meet him at his home. And just to go a little further so you know what is coming in the record for Judge Beckwith to look at, what he actually had that he had A resignation for the appellant to resign as the president and officer and director of this enterprise that they had formed together. Two, was a sale of, purported sale, basically efforts to have her transfer her entire 50% holding in That's your securities fraud that you're talking about? That's part A of the securities fraud, yes. You're talking about when she first signed the papers. I am not. I can get to that in rebuttal. The clear error that we focus on here, while we did raise those other issues down below. Had your client invested any money in the business at that time? She had invested all of her. She invested time, did she invest money? Currency? Dollars? No. She had... Checks or any other way except for her labor. She was working at the shop I guess. And her intellectual property. She was the person that brought the know-how to the enterprise. The appellees brought money. So it took two things. She contributed basically sweat equity or intellectual property contributions to... How much money was the profit? In July of 2012 it was making no profits. It was having a loss, right? It was operating at a loss, yes. Had since the time the shares were issued I guess. That's correct. That's correct. It was a startup business. It's a startup business and in fact both sides understood that in this particular startup, the record's very clear, in this particular startup both sides understood that it wasn't going to make money in the first year or perhaps even the second. And that's corroborated by the testimony of and acts of the defendant appellant who called her to the meeting. And I'll divert a little bit. You were listing three things and you got to two. What's the third? The third one was that she had to sign a piece of paper approving the transactions of transferring her shares. So what I'm taking that is that the second and the third are share transactions. That's correct. She was, you say, fraudulently induced to engage him, right? She was fraudulently induced to sign the transfer papers. But the first one is her resignation. That's not a stock. That's not a securities. I agree with that. That's the second two. That's correct. There are three pieces. And you have to allege, you have to show sufficiently to get past summary judgment, damages from the fact that she sold or purportedly sold these items, right? That's correct. And so the real, it seems to me, the real crux of the question you haven't got to yet, which is whether there's evidence that these were worth more or that she sold them for less than what they were worth. If they had a negative value, then she can't have sold them for what they're worth. It looks like a losing proposition would have negative value, but you brought in some evidence that it had positive value. The district judge didn't, said no genuine issue as to whether these things had positive value. What was wrong with that analysis? Her, the Judge Beckwith's statement was that one of the experts opinion, that we brought two expert opinions into the case, and it's part of the record. The second. Did they examine the, all the profit and loss, income and outflow of this company? Yes, Your Honor. And that's the error, material error, that we believe Judge Beckwith made. She states in her opinion that one of the experts, that's Dr. Rosen, the economist, largely relied on the infer, on the analysis of the first expert. First expert's name was Letha Barnes. She was an expert in the cosmetology industry. She evaluated really another part of the case, which is the value of the services, because we had a contract problem as well. So the record says, the opinion says that Dr., Dr. Rosen, pardon me? The expert's opinion or the judge's opinion? I'm sorry, Judge Beckwith wrote that Dr. Rosen's opinion largely relied, those are her words, largely relied on the information of Letha Barnes. She discounted Letha Barnes as being too rosy, too speculative, not worthy of, of judicial note. What, that's, that's correct, Your Honor. What she said in, when Letha Barnes basically just compiled comparable data. She, Letha Barnes, different businesses that did well, right? No, actually some of the business that she looked at, in her opinion, showed first-year loss, second-year loss, that was part of her compilation. Nice growth. And wonderful growth. So Dr. Rosen, this is the, the error. In Dr. Rosen's opinion, he doesn't rely, quote, largely on Letha Barnes' compilation of data. He looks at five things, as a, as you ordinarily would expect this to happen. He looked at the tax returns of elite, that's the business. He looked at Letha Barnes' compilation. He looked at a business plan, a projection that had been prepared by Dr. Logan. He looked at the bank records, and he looked at testimony from the banker who put, who allowed a loan to be, to be executed and furnished by his bank. So that opinion, even though Judge Beckwith says it relied largely on Letha, was, that's not correct. What she actually, I'm sorry, what Dr. Rosen really did was look at hard financial data. There is no question that he understood that this business would lose money as one projected, and as the parties understood in the first two years. Was Ms. Bender obligated on the loan at the bank, or was that? Ms. Bender was not obligated, Your Honor. Was that by the corporation? It was actually a loan to the other side, the Logan side, guaranteed, and then they loaned the money to the corporation. And so Ms. Bender's credit was not part of the financing, nor was she supposed to. The deal was, and she describes it in the record, this is a 50-50 partnership. That causes the problem. Did she ever offer to just take it all over from them and, and take up the corporation and do all this? I'd think she'd have a losing proposition if she did that. And that's, she's claiming that fraud. Well, she's, she's, she's broken hearted, that's in the record, that she lost her business. But is it correct to assume that Dr. Rosen's analysis that in some years you lose money and some you make, isn't that a, at least an expression that's admissible and, and creates the idea that business, startup businesses lose money. And the record that was compiled indicates that if things are run according to the way the cosmetology school industry is running, it makes money. So to be careful, Dr. Rosen, the value that he ascribed, specifically said, and specifically recognized, that the value of a future flow of income is not nearly as certain as present day. So what he did to recognize the fact of that uncertainty is what economists always do. They dis-, they apply a discount rate to the stream of income. That's what happens in the marketplace, in the public markets. New stock exchange, everywhere. That the future flow of income has to be applied a discount rate because of uncertainty. Now, in this case, Dr. Rosen specifically states that he applied a 15% discount rate to take into account the fact that this is an uncertainty. The point that we're trying to make here is, have we shown some loss? Scott Logan wanted the stock for an economic reason. That's in the record. That should be sufficient for a jury to con-, to be able to conclude that there's a tax benefit of some sort that Scott Logan wants, and he took it away. Did we ever find out whether this business is still operating or whether it's gone under? I can tell you what I know. It's not in the record. Well, you don't need to tell me what you know, but I just wondered if it's a great success now or it's gone. Well, counsel, counsel for the business could tell you that, and I would certainly not object to it, whatever he says, because I know the answer. Thank you, Your Honor. Thank you, counsel. Good morning. May it please the court. Charles Miller, Keating Muting and Klee Camp, on behalf of the defendants. The complaint that was asserted obviously asserted several claims. We're here today because of one claim, which was a federal securities claim, and it was asserted initially, actually it's been asserted against all of the defendants. The only allegations of actual federal securities fraud were against Dr. Logan and perhaps against Julie Logan, so certainly the dismissal of the federal claims against the landholding company, the actual elite institute, the school, and the trust were properly dismissed, so there are no federal claims at all against those entities. Second, in this case, Judge Beckwith simply applied existing law of this court. They're really, this is well within the parameters of determining what is federal securities fraud, and you know, we're not talking about common law fraud. There are state law claims for that that they can assert, and in fact did assert here and then asserted again in state court once the claims below were dismissed. The state law claims obviously were dismissed without prejudice, and so... If we just focus now on what your opposing counsel focused on, you have a transaction where it's that one of your clients said things that appeared very misleading, like these are just a few documents for you to sign, not much here, and she's signing away her whole interest in the business. Without more, that looks misleading. You could say it wasn't misleading because she should have read them, I suppose. That is my first response. Okay, so if we assume, I understand that response, but to get past it because we only have limited time, let's assume from the moment that that was misleading or it was fraudulent, you still say no recovery because no loss was shown, is that correct? That is correct. How do you respond to the argument that this report by Mr. Rosen, I guess, PhD... Harvey Rosen. Provides evidence of that? I mean, I'm looking through it. Looks like it provides evidence. It provides evidence of other things, which are not before us, but it also talks about how economists and financial analysts, when making a business evaluation, capitalize the earnings of the enterprise at the end of a 10-year period to establish a current market value of the enterprise now, and then goes on to do that after having read various documents. Why isn't that enough? So first, I'm going to disagree with my brother, counsel, and say that this was relied, his report did rely upon the Barnes report to determine this blue sky value. It was from her where he got the numbers to determine that, hey, there could be profits here in the future. You want to tell us what's wrong with her report then? Well, yes, so first, so with both. So with her report was she did no analysis of this business whatsoever. She looked at a few businesses somewhere else in the country and said, oh, they all have this number of students, and they receive federal aid, which allows them to make a profit. Cosmetology school is going to qualify for federal student aid. This one has not, and so it wasn't in that same caliber. So they're making assumptions that Mr. Logan will continue to provide finances to this business to get it to a point to where it would qualify for financial student aid, that then down the road it would make speculative profit, and there is nothing that shows that this type of analysis of what may be available in the future actually is the value of the present stock. I don't remember whether she did or did not, but did Judge Beckwith focus upon that feature that these other schools that were used in the preparation of the valuation did not, did receive federal subsidies? She did not focus on that aspect. Right, I thought not, okay. But she focused just more generally that they were far off schools, the expert refused to identify even which schools they were, and that they weren't... But at the summary judgment stage, of course, Judge Beckwith didn't have any contrary reports on behalf of your client, valuations. No reports. What she had was the actual financial information, which indicated that this was a business that there was no value in it, and the only thing that would keep it of value is if my client was continuing to put money into it. If they stopped, then there's no business. And so it's difficult to have value in an enterprise where it's continuing to rely upon the continued injections. And so what we have is Mr. Rosen's acknowledging that what he is saying is that he was trying to create a value to say, well, if you operated this for 10 years, this is maybe how much you could make, and this would be the present value of what you made. That is not an economic loss. Did the district court reject it under Daubert principles, or she just didn't believe it? I think it was rejected under Daubert principles, Your Honor. Did she cite that? She did not cite Daubert specifically as far as them not being qualified to offer opinions. It was just the opinions that were being offered weren't relevant to what was going on here. Mr. Rosen certainly is a qualified economist. He testifies in numerous cases. So they weren't challenged as far as the ability to give opinion, but whether the opinions were relevant to what was going on here. And again, economic loss is what we need for federal securities claim. That's what distinguishes this, and I mentioned this earlier, from state law fraud. And economic loss specifically defined by this circuit most recently in Taylor v. Key Corp., so this is a very recent case, 2013. There must be a purchase at an inflated price and sold at a loss for an economic loss. So there has to be an actual economic loss that occurs. You have to pay more than what you receive at the end. So there wasn't an economic loss. Again, we challenge whether or not they can say that there was a misrepresentation because the plaintiff could have read the documents. She's acknowledged throughout here she didn't read any of the documents, including the very initial documents at the beginning, and we're not really talking about that now, but those set up what the structure of the business was, the classifications of the stock. She signed all of these, didn't read them, said that she wouldn't have understood them if she had read them. And with respect to when she gave up the stock in 2012, she stated that had she asked Scott Logan to let her read them, he would have. So she walked in, she signed the documents, and this is the facts that are most in her favor. She walked in, she signed the documents, he would have let her look at them if she chose. She did not so choose. She says that that's her routine practice is to not read the documents. And so we're left with her signing documents that control the contents of the document to contrast the document itself. That is not permissible. And in their reply brief, the appellants state that the text messages are representation outside the contract. It's not whether the misrepresentation is alleged to occur outside the contract. It's whether you're misrepresenting a fact outside of the contract. And this is something that we rely upon really Ohio law on in this context. Federal security claims, you look at the state law. The case on that is A.B.M. Farms. It's an Ohio Supreme Court case from 1998. And it relies upon cases going back to the 1800s. And one of the quotes from there is a person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended when he could have known the And that is exactly what we have here. So you cannot claim misrepresentation of the document. The document controls. Otherwise, we don't have contract law anymore. We just throw the papers aside and we put all the witnesses on and whatever they say and whoever is believed is believed. I take it that by signing away her interest, she never was obligated to any of the debt. I take it. She never was. She didn't receive that benefit to debt forgiveness. She did not receive that benefit. The only kind of allegation we heard today of any potential value were the capital gain write-offs or the net operating losses that my client was interested in. There's no evidence at all that the plaintiff had any ability to use those. There was no investment she made in the And that's not a debt liability either. She put no money in and she didn't obligate herself in any loans. That is correct, Your Honor. And with respect to sweat equity, she also had an employment contract that provided for $30,000 a year. Did she ever get a salary there? There was some question about getting paid something. She did not actually receive that salary. She has a claim for that. And there's a contract law claim. That's a state law claim. So if there are no further questions for me, I know I have a lot of time left. Thank you. At this stage in the proceeding in the lower court, we were obliged, as I understood the law, and the law is very clear, to show a loss. We have to show a loss. We don't have to show the quantity of the loss. We have to show a loss. We showed the loss. All of that property that she put in, the intellectual property, the ideas, the curriculum, for which she was paid nothing, by the way. That's a different issue. The losses, I understand, in her securities losses, if she'd kept those shares, they would have been worth more. But she was fraudulated into selling them and so therefore suffered that loss, right? That's the loss that you've got to allege. The loss that she... I'm sorry. Isn't that right? Well, the loss that she... It's not that she didn't get her salary. No, no. Not at all. We'll deal with that in a totally different... So the way you would calculate the loss is not how much she would have... For the particular fraud that you're talking about that occurred on this July day, that loss is the difference in the value of what she sold for nothing. And its value, which was more than nothing. That's the amount of the loss. That's right. The fact that she incurred a loss is, I think, the element of 10b-5. All right. I think... The second part is... I think that's right, but I want to ask a question about that. Please. And that is, you seem to rely primarily, at least in this part of your argument, on the analysis of Dr. Rosen, right? For the quant... For the loss. For the quantification of the loss. Quantification of being more than zero. Yes, sir. Because if it's less than zero, it's not a loss, all right? And you said there's a lot of... It doesn't just rely on the Barnes report. Yes, sir. Well, I'm trying to see if that's accurate, so bear with me here. I do see that it says on page one that I have the information of loan documents, tax returns, the business plan, and the deposition of a loan officer, but then the next five paragraphs all deal with the loss because she wasn't paid. There's just one paragraph there that deals with the evaluation of the stock, which is the issue we're talking about here, and this is what it says. It's common practice by economists, which he should know, when making these evaluations to capitalize the earnings of the enterprise at the end of a 10-year holding period to establish a market value. Sentence one. Sentence two. Information provided by Barnes indicates that the norm is three to five times this acronym, and this standard was applied to the 10th-year protection of this acronym, which results in a value between $2.4 million and $4 million, and the projection is seven years, and my findings indicate that this component of her loss was between $400,000 and $700,000. That sounds to me, but you can set me straight like he's relying on the Barnes report, and since that's the only narrative paragraph that goes to the value, I can see how Judge Beckwith could come to the conclusion that it relies on the Barnes report. Can you explain to me why it's not relying directly on the Barnes report? No. We never take the position that it's not relying on Barnes. We're taking the position that Barnes. You did earlier. You said, oh, that was her error is that she said that it just relied on the Barnes report, and instead it relies on all this other stuff, but I'm not finding that. Do you see what I'm asking? Yes, I do. The error was Judge Beckwith saying that Dr. Rosen relied largely on the Barnes data compilation, but in fact... Isn't that the case? Pardon me? Isn't that the case? No, Your Honor. What he specifically says he had available to him were the tax returns that show assets, balance sheet, income, revenue. It's a federal tax return. He doesn't analyze them as judge. If you look back, there's only two pages of documentary documents that support this, and they just seem to say the share of the net income for the next eight years. Where's he getting that? He's getting that from Letha Barnes compilation of comparable businesses in the same place, okay? So the numbers 450,000 to 750,000 are coming from the application of an algorithm or a program or an analysis to numbers from comparable businesses that are found in the Barnes report. That's right. Tested against the numbers that were in the federal tax return and tested against that business projection that Dr. Logan prepared and submitted to the bank. All of those things were what allows him to support his opinion as to whether or not any one of the elements financially that he's relying on are accurate. Do those take into account failed cosmopolitan? I can't say the word. Failed, I'm sorry? Failed schools like that? Well, yes. In fact, some of that data is based upon acquisitions, and the acquisitions are based upon that acronym EBITDA, whether you have earnings or not. And her compilation takes into account that these schools don't earn money in the first two years. And the record's pretty clear about that. I actually don't know whose time I'm using up based on this clock, but the testimony is that the parties understood that this enterprise was likely to lose money the first two years because A, it's a startup, and B, in order to qualify for assistance for some of the students in a federal Appalachian grant program, you must be in business two years. So everybody was ready to do that. And in fact, it's verified by the Lisa Barnes numbers. To establish that loss... Buy something that's already gone through the first two years of loss and pay a million dollars for it? At least. This is not part of the record. But buying something that already owes a million dollars, that already owes a ton of money? Yes, Your Honor. If you look, I mean, this is totally not part of the record, but it's just part of the economy of the United States. If you look at the startup businesses that are flourishing here, many of them in the startup years had no profits. And in fact, I think it's pretty clear, I don't... This isn't part of the record. It's also true that at least 50% of startups fail. They do, Your Honor, but only 50%. And aren't we entitled, as the party against whom this evidence is being construed, for a favorable inference? So even in your example, aren't we entitled to the 50% that make it? Aren't we entitled to rely on an opinion that takes into account that startup businesses lose money? Thank you, Your Honor. Thank you. Thank you, Your Honor. The case will be submitted, and you can dismiss the court.